|  |  |
|---|---|
| STEPHANIE COX *and* MATTHEW BROOKS<br>        *Plaintiffs,*<br><br>                    *v.*<br><br>MARILYN DAWSON *and* EDWARD K.<br>DUNFORD,<br>        *Defendants.* | Civil No. 3:18-cv-578 (JBA)<br><br><br>January 10, 2020 |

### RULING ON SUMMARY JUDGMENT MOTIONS

This two-count 42 U.S.C § 1983 action arises from an unscheduled inspection of Plaintiff Stephanie Cox's public housing unit by a Housing Authority of New Haven contractor that resulted in the warrantless arrest of Plaintiff Matthew Brooks. In Count One, Plaintiff Cox brings an unlawful search claim against Marilyn Dawson, a manager for the Housing Authority of New Haven. In Count Two, Plaintiff Brooks asserts a false arrest claim against Officer Edward K. Dunford. Defendants Dawson and Dunford now independently move for summary judgment.

For the reasons that follow, Defendant Dawson's Motion for Summary Judgment [Doc. # 27] as to Count One is denied, and Defendant Dunford's Motion for Summary Judgment [Doc. # 30] as to Count Two is granted.

### I.  Background

#### a.  Parties

Plaintiff Stephanie Cox is a tenant in a public housing unit operated by the Housing Authority of the City of New Haven ("HANH"). (Dawson and Cox L.R. Stmts. [Docs. ## 29, 34-1] ¶ 3.) During the relevant time period, Ms. Cox lived in an apartment at 82 South Genesee Street in New Haven, Connecticut with her daughter A.C., a minor child born in 2009. (Ex. 1 (Lease) to

Dawson L.R. Stmt. [Doc. # 29-1] at 1.) She was employed at an office in North Haven, Connecticut. (Dunford and Brooks L.R. Stmts. [Docs. ## 31, 33-1] ¶ 10.)

Plaintiff Matthew Brooks is married to Ms. Cox, and he is the stepfather to A.C. (*Id.* ¶¶ 1, 5.) During the relevant time period, Mr. Brooks did not reside at 82 South Genesee Street, because "there[] [were] certain issues that he was taking care of as far as his background to get accepted on the lease." (Ex. 1 (Cox Dep.) to Dunford L.R. Stmt. [Doc. # 31] at 9.) However, Mr. Brooks was a frequent guest at 82 South Genesee Street, and he would come to the apartment to babysit A.C. while Ms. Cox was at work. (Dunford and Brooks L.R. Stmts. ¶¶ 8-11, 13, 14.)

Defendant Marilyn Dawson is a property manager for HANH, a provider of public housing in the City of New Haven. (Dawson and Cox L.R. Stmts. ¶ 1.)

Defendant Edward K. Dunford is a police officer with New Haven's Department of Police Service. (Dunford and Brooks L.R. Stmts. ¶ 20.)

    *b. HANH Inspection of Ms. Cox's Apartment*

The South Genesee HANH development complex, where Ms. Cox resided, was subject to United States Department of Housing and Urban Development ("HUD") regulations for public housing facilities. (Lease at 10.) Every year, the development was required by HUD to undergo a "Uniform Physical Conditions Standard" inspection for damage and hazards. (Ex. 2 (Inspection Notice) to Dawson L.R. Stmt. [Doc. # 29-3] at 1.) In anticipation of these federally mandated inspections, HANH maintenance staff and inspectors conducted mandatory "pre-inspections" to assess the condition of individual units and perform work where necessary. (*Id.*)

Ms. Cox's lease with HANH makes multiple references to housing inspections. Section 8(D) explains that "HUD representatives or local government officials may review HANH operations and as a part of their monitoring may inspect a sampling of HANH's units." (Lease at

9.) Section 8(F) provides that "HANH will provide 48-hour notice of inspection to Tenant(s) for non-emergency inspections." (*Id.*) Relatedly, at Section 6(R), the lease specifies that a tenant must "[p]ermit entry into the Unit by HANH staff for inspection and maintenance" and that "[e]xcept in the case of emergencies, for which HANH has the right of immediate access, HANH will give reasonable advance notice and entry will be during reasonable times." (*Id.* at 6.)

In July 2017, HANH notified tenants of the annual inspections. (Dawson and Cox L.R. Stmts. ¶¶ 9, 10.) HANH hand-delivered a flyer to Ms. Cox, which advised that "all housing authority apartments located in the South Genes[e]e complex" would undergo their mandatory pre-inspections over the next two months. (*Id.*) The HANH inspection notice stated that "housing authority employees will be entering the apartment units with inspectors" to prepare for the annual HUD visit and that "inspections will take place in July and August of 2017 between the hours of 9 AM and 5 PM." (*Id.* ¶¶ 11, 12.) The notice also stated that "[o]ver the course of several days, HANH staff will be inspecting the entire development so arrival times may vary." (Inspection Notice at 1.)

After receiving this inspection notice between July 23 and 27, 2017, (Cox Interrogatory [Doc. # 34-3] at 1), Ms. Cox made a telephone call on July 31, 2017, to "the housing authority and tried to specially schedule her inspection," (Dawson and Cox L.R. Stmts. ¶ 14). Ms. Cox recalls that she spoke directly with Ms. Dawson and "inform[ed] her that without exactly 48 hours notice that [Ms. Cox] do[es] not give anyone permission to enter [her] apartment." (Cox L.R. Stmt. § B ¶ 2.) Ms. Dawson avers that it was a different HANH employee who spoke with Ms. Cox and instructed her that "the specific time of each inspection could not be stated in advance because of the fact that each unit was going to be inspected." (Ex. 3 (Dawson Aff.) to Dawson and Cox L.R. Stmts. [Doc. # 29-3] ¶ 4.)

On August 11, 2017, a HANH contractor, Stanley Worrell,[1] entered Ms. Cox's apartment to perform a "pre-inspection" inspection. (Dawson and Cox L.R. Stmts. ¶¶ 9, 10.) He did so in the late morning, while Ms. Cox was at work. (Dunford and Brooks L.R. Stmts. ¶¶ 22, 29.) After entering, Mr. Worrell found Ms. Cox's eight-year-old daughter A.C. home "alone in the unit" and "hiding under the covers of the bed in the main bedroom." (*Id.* ¶ 25.)

Ms. Dawson avers that she was not working the day that Mr. Worrell inspected 82 South Genesee Street, a fact that Ms. Cox does not dispute but that appears to be in tension with other evidence in the record. (Dawson and Cox L.R. Stmts. ¶ 18.)

 *c. The Arrest of Mr. Brooks*

After Mr. Worrell found A.C. in the apartment, police officers were dispatched to the address on report of a child being found alone in the residence. (Dunford and Brooks L.R. Stmts. ¶ 22.) New Haven Patrol Officer Edward Dunford was sent as the primary officer on the call. (*Id.*)

Upon his arrival at 82 South Genesee Street at approximately 11:15 a.m., Officer Dunford encountered Mr. Worrell and Ms. Dawson, who were "standing . . . outside of the open front door of th[e] unit." (*Id.* ¶¶ 22, 23.) Ms. Dawson informed Officer Dunford that HANH was inspecting its units, that tenants had received notice of these inspections, and that a HANH contractor had found a female child alone in the 82 South Genesee Street unit during one of these inspections. (*Id.* ¶¶ 23, 24.) Officer Dunford also reported that Ms. Dawson told him that "she sent out notices to all the tenants saying they would be doing checks of the apartments for the whole month of August." (Ex. 5 (Reporting Officer Narrative) to Dawson L.R. Stmt. [Doc. # 29-5] at 4.).

---

[1] Mr. Worrell was originally named as a defendant to this action but was dismissed on consent for failure to effect timely service [Doc. # 25].

Ms. Dawson provided Officer Dunford with Ms. Cox's contact information and informed him of A.C.'s name and age. (*Id.* ¶¶ 26, 27, 29.) Officer Dunford then called Ms. Cox about her whereabouts. (*Id.* ¶ 29.) Ms. Cox explained that "she was on her way home from work, that she would be arriving shortly at which time she would speak with him, and that her daughter had been left alone for only a couple of hours." (*Id.*)

Officer Dunford then spoke with A.C., who said that Mr. Brooks, whom she identified as her "dad," was on the telephone line. (*Id.* ¶ 32.) Officer Dunford accepted the call. During their telephone conversation, Mr. Brooks told Officer Dunford that "there was a babysitter there, but that she must have left, and that he was returning to 82 South Genesee Street." (*Id.* ¶ 33.)

Mr. Brooks arrived at the apartment approximately an hour and a half after the telephone conversation and again spoke with Officer Dunford. (*Id.* ¶ 35.) Mr. Brooks stated that Ms. Cox had "left for work at approximately 6:00 a.m." and that he had remained at the apartment "until approximately 10:00 a.m. when he had to go to downtown New Haven to obtain his medication." (*Id.* ¶ 36.) Mr. Brooks's trip to obtain the medication was a routine part of his participation in a drug treatment program. (Brooks L.R. Stmt. § B ¶ 2.) Mr. Brooks also told Officer Dunford that "before leaving to obtain his medication, he had gone to 102 South Genesee Street to ask the neighbor there . . . about keeping an eye on the minor child." (*Id.* ¶ 37.)

After this conversation, Officer Dunford looked for the neighbor at 102 South Genesee Street, but the individual who opened the door was not the neighbor in question. (*Id.* ¶ 40.) That individual said the neighbor was not home and that "no one had mentioned anything about watching any children on this day." (*Id.*)

Officer Dunford then "returned to 82 South Genesee Street and asked Plaintiff Brooks why he had left the minor child alone." (*Id.* ¶ 42.) Mr. Brooks again "responded that he had to go to his

meeting to obtain his medication" and "that this was the only time he could go and get his medication and that he could not take child with him because of the meeting." (*Id.* ¶¶ 42, 43.) Later, Mr. Brooks admitted that "on the day of this incident, [he] made no attempt to locate a babysitter to watch the minor daughter of Plaintiff Cox while he was . . . away from the residence, and what he told Defendant Dunford about trying to locate a babysitter was not true." (*Id.* ¶ 41.)

Officer Dunford then "placed a telephone call to [the Connecticut Department of Children and Families ("DCF")] to make a referral because a minor child was involved in the incident." (*Id.* ¶ 44.) Officer Dunford states that the DCF representative expressed the opinion that it was unreasonable to leave an eight-year-old child home alone. (*Id.* ¶ 45.)[2]

Ms. Cox returned to 82 South Genesee Street sometime after this call. (*Id.* ¶ 46.) The parties agree that Ms. Cox's arrival occurred "[a]pproximately one-half hour after the arrival of Plaintiff Brooks, and approximately two (2) hours after she spoke with Defendant Dunford on the telephone." (*Id.* ¶ 46.) After Ms. Cox's arrival, Officer Dunford explained to both Plaintiffs that "leaving an eight (8) year old child home alone was irresponsible, that Plaintiff Brooks should not have left the child home alone, and if there was an emergency, neither of them would have been able to return to 82 South Genesee Street in a reasonable amount of time." (*Id.* ¶ 47.)

Officer Dunford then informed Mr. Brooks that he was under arrest for risk of injury to a minor, in violation of Conn. Gen. Stat. § 53-21. (*Id.* ¶ 51.) As he was taken into police custody, Mr. Brooks denied being present at 82 South Genesee Street at any time that day. (*Id.* ¶ 51.)

---

[2] Mr. Brooks disputes the correctness of this opinion, (Brooks L.R. Stmt. ¶ 45), but does not appear to dispute the fact that the DCF representative offered such an opinion.

On October 31, 2017, Mr. Brooks appeared in Connecticut Superior Court in the matter of *State of Connecticut v. Matthew Brooks*, N23N-CR17- 0178398-S (Conn. Super. Ct. Oct. 31, 2017). (Ex. 7 (Superior Court Transcript) to Dunford L.R. Stmt. [Doc. # 31] at 1.) At the hearing, the state prosecutor entered a *nolle prosequi*, after having verified that "Mr. Brooks ha[d] successfully completed a treatment program." (*Id.* at 2.)

On April 5, 2018, Plaintiffs Cox and Brooks filed their Complaint [Doc. # 1] commencing this action, bringing separate and individual constitutional claims under 42 U.S.C. § 1983. Plaintiff Cox directs her unlawful search claim at Defendant Dawson, while Plaintiff Brooks directs his false arrest claim at Defendant Dunford. Defendants Dawson and Dunford each move for summary judgment [Docs. ## 27, 30].

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks omitted).

"The moving party bears the initial burden of showing why it is entitled to summary judgment." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Where, as here, the nonmovant bears the burden of proof at trial, the movant may show prima facie entitlement to summary judgment in one of two ways: (1) the

movant may point to evidence that negates its opponent's claims or (2) the movant may identify those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact, a tactic that requires identifying evidentiary insufficiency and not simply denying the opponent's pleadings." *Id.* at 272–73 (citing *Celotex*, 477 U.S. at 323). "If the movant makes this showing in either manner, the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Id.* (citing Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

### B. Count One: Ms. Cox's Unlawful Search Claim Against Ms. Dawson

To succeed on a 42 U.S.C. § 1983 claim, a plaintiff "must show 'the violation of a right secured by the Constitution and laws of the United States' and that 'the alleged deprivation was committed by a person acting under color of state law.'" *Jones v. Cty. of Suffolk*, 936 F.3d 108, 114 (2d Cir. 2019) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). Here, Plaintiff Stephanie Cox claims that Defendant Marilyn Dawson, a housing official,[3] "instructed and caused [inspector] Worrell to break and enter into [her] private residence," thereby violating the Fourth Amendment. (Compl. ¶ 6.) Defendant Dawson moves for summary judgment on this claim. She contends that Plaintiff Cox's Fourth Amendment rights were not violated because the inspection of 82 South Genesee Street did not amount to a search and because Plaintiff Cox provided consent to entry in her housing contract. In the alternative, Defendant Cox contends that she was not directly involved in

---

[3] For the purposes of this motion, Defendant Dawson concedes that she was acting under color of law. (Dawson Mem. [Doc. # 28] at 7.)

the entry of Ms. Cox's apartment, and so cannot be held liable for any constitutional violation.[4] The Court will address each of Defendant Dawson's arguments in turn.

    *a. Nature of the Inspection*

Defendant Dawson contends that Plaintiff Cox's claim must fail because the inspection was nothing more than a trespass, and so did not implicate the Fourth Amendment.

The Fourth Amendment "protects the rights of private citizens to be free from unreasonable government intrusions into areas where they have a legitimate expectation of privacy." *United States v. Lambus*, 897 F.3d 368, 402 (2d Cir. 2018) (internal quotation marks and alteration omitted). "A warrantless inspection of a private dwelling by a municipal administrative officer without the consent of the owner is generally unreasonable absent specifically delineated circumstances." *Palmieri v. Lynch*, 392 F.3d 73, 78–79 (2d Cir. 2004); *see also Camara v. Mun. Court of City & Cty. of San Francisco*, 387 U.S. 523, 534 (1967) (holding that "administrative searches . . . are significant intrusions upon the interests protected by the Fourth Amendment" and "that such searches when authorized and conducted without a warrant procedure lack the traditional safeguards which the Fourth Amendment guarantees to the individual"). "The carefully circumscribed exceptions to the warrant requirement, as relevant here, include the exigent-circumstances exception, which applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable . . . [and] the consent

---

[4] Defendant Dawson also makes a cursory assertion that the Court should enter summary judgment in her favor on the grounds that Ms. Cox has not shown damages. (*See* Dawson Mem. at 7). But this argument fails as a § 1983 claim has only "two elements: (1) the violation of a right secured by the Constitution and laws of the United States, and (2) the alleged deprivation was committed by a person acting under color of state law," both of which are alleged here. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87–88 (2d Cir. 2015) (cleaned up).

exception for cases where voluntary consent is given to the search." *Mitchell v. Wisconsin*, 139 S. Ct. 2525, 2543 (2019) (cleaned up).

Without addressing any case law on the constitutional protections afforded to administrative searches, Defendant Dawson argues that Plaintiff Cox herself characterized Defendant Dawson's conduct as a "trespass[] upon the private residential property of the plaintiff" in one paragraph of her Complaint, (Dawson Mem. at 8 (citing Compl. ¶ 9)), and that "[t]respass alone does not qualify as a search under the Fourth Amendment" because the incursion "must be conjoined with an attempt to find something or to obtain information," (*id.* (citing *United States v. Jones*, 565 U.S. 400, 408 n.5 (2012)). Defendant Dawson supports this argument by citing *Schipke v. Connecticut*, No. 3:17-CV-02087 (JAM), 2019 WL 121783, at *6 (D. Conn. Jan. 7, 2019), which dismissed a Fourth Amendment claim that was premised solely on trespass and that did not make any reference to a search, seizure, or inspection within that count of the complaint, *see* Compl. at 33, *Schipke*, No. 3:17-CV-02087.

Defendant Dawson's argument and reliance on *Schipke* fail because Plaintiff Cox *has* alleged that the entry into her apartment was "conjoined with . . . an attempt to find something or to obtain information." *Jones*, 565 U.S. at 408 n.5. In Count One, Plaintiff Cox twice claimed that the inspection here constituted a search. (*See* Compl. ¶¶ 6, 8.)

More importantly, a housing inspection, like the one conducted here, is a classic example of an administrative search. *See Camara*, 387 U.S. at 534 (establishing that an inspection for housing code violations qualifies as an administrative search). At oral argument, Defendant Dawson asserted that the inspection was not a search because HANH's purpose was to inspect the premises rather than to collect information on the tenant. However, it has long been settled that the "routine inspection of the physical condition of private property" qualifies as a search, even

though it may be a "less hostile intrusion than the typical policeman's search for the fruits and instrumentalities of crime." *Id.* at 530. And because such an inspection qualifies as a search, it must comport with the "traditional safeguards which the Fourth Amendment guarantees to the individual." *Id.* at 534; *see also City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2452 (2015) (clarifying that the Fourth Amendment standard applies to all administrative searches and that "absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker" through a warrant or some similar procedure).

Thus, the inspection of Plaintiff Cox's apartment cannot be brushed aside as a mere trespass outside the bounds of the Fourth Amendment.

### b. *Consent to Search*

Defendant Dawson also argues that no Fourth Amendment violation occurred because Plaintiff Cox consented to the inspection through her lease agreement with HANH. This lease agreement requires Plaintiff Cox to "[p]ermit entry into the Unit by HANH staff for inspection and maintenance" and provides that "[e]xcept in the case of emergencies, for which HANH has the right of immediate access, HANH will give reasonable advance notice and entry will be during reasonable times." (Lease at 6.) The lease further specifies that "HANH will provide 48-hour notice of inspection to Tenant(s) for non-emergency inspections." (*Id.* at 9.) Defendant Dawson takes the position that the "housing authority was permitted to enter Ms. Cox's apartment unit to perform routine inspections provided that reasonable notice was given to Ms. Cox." (Dawson Mem. at 9.) Without offering a thorough interpretation of the lease's terms, Defendant Dawson maintains that such reasonable notice of Mr. Worrell's inspection was provided because 1) HANH delivered an inspection notice flyer in July, 2) the flyer informed Plaintiff Cox that inspections would occur

11

during business hours during the months of July and August, and 3) the inspection of 82 South Genesee Street ultimately occurred on August 11, 2017, which was within the noticed time period. (*Id.* at 9-10.)

Plaintiff Cox responds that "the entry here was not 'reasonable' because it was expressly prohibited both by the terms of the leas[e] and by the plaintiff's oral instructions to the defendant." (Cox Opp. [Doc. # 34] at 5.)

To determine whether an individual has consented to a warrantless search, a court must engage in "careful scrutiny of the totality of the circumstances" as to "the voluntariness of such 'consent.'" *Anobile v. Pelligrino*, 303 F.3d 107, 124 (2d Cir. 2002). The standard for assessing the scope of an individual's consent is "that of 'objective' reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). "The official claiming that a search was consensual has the burden of demonstrating that the consent was given freely and voluntarily." *Anobile*, 303 F.3d at 124. "[A]n important component of this inquiry [is] 'evidence that the person had knowledge of the right to refuse to give consent.'" *Id.* (quoting *Security and Law Enforcement Employees v. Carey*, 737 F.2d 187, 202 n.23 (2d Cir. 1984)). The terms of a public housing benefit may not "constitute a waiver of Fourth Amendment rights" for the purposes of establishing consent. *Gutierrez v. City of E. Chicago*, 2016 WL 5819818, at *8 (N.D. Ind. Sept. 6, 2016) (concluding that the term of a public housing lease that "inspections will be conducted" does "not excuse the Fourth Amendment requirements of consent, exigent circumstances, or a warrant"), *report and recommendation adopted*, No. 2:16-CV-111 JVB, 2016 WL 5816804 (N.D. Ind. Oct. 5, 2016); *see also Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013) ("[T]he unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them."); *see also, e.g., Anobile*, 303 F.3d at 123-25 (concluding

that the signing of a license application, which contained an express waiver of the right to object to searches, did not constitute an effective consent to residential searches); *Pope v. Gary Hous. Auth.*, 2012 WL 1035449, at *4 (N.D. Ind. Mar. 27, 2012) (rejecting defense that public housing tenants consented to warrantless searches of their units by facility security officers because the tenants signed waivers in their leases).

Here, the record shows that Plaintiff Cox expressly *refused* to grant access to her apartment for the entire period of July and August by calling the HANH office and stating that "without exactly 48 hours notice that [Ms. Cox] do[es] not give anyone permission to enter [her] apartment." (Cox L.R. Stmt. § B ¶ 2.) Although the parties disagree as to which HANH employee took this call, there is no dispute as to the existence and substance of such a call. (*See* Dawson and Cox L.R. Stmts. ¶ 14; Ex. 3 (Dawson Aff.) to Dawson L.R. Stmt. [Doc. # 29-3] ¶ 4.) Because Plaintiff Cox has provided undisputed evidence that she explicitly refused any entry to her apartment without 48 hours' notice as to when precisely the inspection would occur, Defendant Dawson has failed to meet her summary judgment burden of demonstrating that Plaintiff Cox "freely and voluntarily" provided consent to have her apartment inspected at an unspecified time in July or August of 2017. *Anobile*, 303 F.3d at 124.

Despite this undisputed evidence of Plaintiff Cox's express refusal of any non-emergency inspection "without exactly 48 hours notice," (Cox L.R. Stmt. § B ¶ 2.), Defendant Dawson nonetheless contends that Plaintiff Cox provided her consent to Mr. Worrell's inspection through her lease with HANH. Defendant Dawson conclusorily maintains that "that Ms. Cox was obligated to allow the housing authority to enter her unit for routine inspections so long as 'reasonable notice' was provided" in accordance with Sections 6(R) and 8(F) and that the "notice provided to Ms. Cox of the upcoming inspections was reasonable." (Dawson Mem. at 9-10.) In making this

13

argument, Defendant Dawson assumes that the lease's "reasonable notice" provision at Section 6(R) and "48-hour notice" provision at Section 8(F) permit HANH to announce a plan to inspect an apartment during some extended future time period that is far greater than 48 hours, without alerting a tenant of the specific date that an inspection will occur. Defendant Dawson also appears to read the HANH lease as a waiver of Plaintiff Cox's right to refuse any inspection that is preceded by a general notice of an extended inspection period.

But Defendant Dawson's interpretation of the lease's inspection provisions conflicts with the standard understanding of the term "notice" when used in the context of a landlord's right to entry. For example, the Revised Uniform Residential Landlord and Tenant Act ("RURLTA") specifies that when "notice" is "given under this section before the landlord enters the unit, the notice must state the intended purpose for the entry and the date and a reasonable period during which the landlord anticipates making the entry." Revised Uniform Residential Landlord and Tenant Act § 701(f). Although Connecticut has not adopted RURLTA § 701(f), the limited Connecticut case law on unauthorized landlord entry indicates that notice is reasonable when it includes a specific date. *See, e.g, Spin Ghar Properties, LLC v. Stewart*, No. HFH-CV16-6001697-S, 2016 WL 5853018, at *4 (Conn. Super. Ct. Aug. 25, 2016)[5] (concluding that an "October 30, 2015 provision of written notice to Stewart of its intent to enter the dwelling unit on November 6, 2015 between the hours of 10am-12pm was reasonable with regard to the length of notice and as to the

---

[5] Defendant Dawson makes a related statutory argument as to "reasonable notice" that also fails. She contends that the inspection was lawful because it comported with Conn. Gen. Stat. § 47a-16, which provides that the "landlord shall give the tenant reasonable written or oral notice of his intent to enter and may enter only at reasonable times." Defendant Dawson has not provided any Connecticut case that articulates the contours of § 47a-16, let alone interprets this tenant-protective statute as relieving a landlord of the requirement to provide a specific date from which the notice period can be measured.

times for intended entry"). Additionally, federal regulations require housing authorities like HANH to provide "reasonable advance notification" of inspections and define that term as a "written statement specifying the purpose of the [Public Housing Authority] entry delivered to the dwelling unit at least two days before *such entry*." 24 C.F.R. § 966.4. This language is naturally read as requiring notification of when the actual entry will occur. If Defendant Dawson were correct that the term "notice" was so broad as cover a general expression of an intent to enter an apartment, then HANH could allow inspection periods to stretch for months at time so long as it gave tenants some warning as to when the inspection period was beginning and when it was ending. But it would of course be unreasonable for HANH to, for example, announce a six-month inspection period and claim that it comports with the lease—a point that Defendant Dawson's counsel conceded at oral argument. Absent any explanation from Defendant Dawson as to how a two-month inspection period can satisfy the lease's "reasonable notice" and "48-hours notice" provisions, the Court is not persuaded that the HANH lease permits inspections without notice of the specific date of entry.

Even if Defendant Dawson's argument as to the lease were correct as a matter of contractual interpretation, a constitutional problem would remain. Plaintiff Cox's lease cannot be read as irrevocably waiving her right to refuse entry to her apartment for weeks or months at a time without running afoul of the unconstitutional conditions doctrine, which "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz*, 570 U.S. at 604; *accord Anobile*, 303 F.3d at 125 (concluding that "acquiescence to a blanket waiver of the right to object to any future searches of the plaintiffs' residences" as a condition of receiving a commercial license cannot be treated as consent in the Fourth Amendment context). If it were otherwise, eligible tenants would have to bargain away their

15

Fourth Amendment rights for lengthy and for indeterminate periods to receive public housing benefits.[6]

In sum, the inspection of 82 South Genesee Street was an administrative search that implicated the Fourth Amendment, and the facts are undisputed that Plaintiff Cox did not consent to this search. Defendant Dawson has not invoked any other exception to the Fourth Amendment's warrant requirement, as she has not claimed that any exigent circumstances existed or that any "special governmental needs [we]re present" that would have otherwise justified an unscheduled and warrantless inspection of Plaintiff Cox's apartment. *Palmieri*, 392 F.3d at 79. Thus, Defendant Dawson has not satisfied her burden of establishing that no Fourth Amendment violation took place.

### c. *Personal Involvement in the Search*

As an alternative argument for summary judgment, Defendant Dawson contends that she was not directly involved in the inspection of Plaintiff Cox's apartment, and thus cannot be held liable for any resulting constitutional violation.

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). "[P]ersonal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being

---

[6] Indeed, the U.S. Department of Housing and Urban Development itself has been clear that "[p]ublic housing tenants have the same privacy rights as tenants of other housing." HUD, *Public Housing Occupancy Guidebook*, at 200 (June 2003) (available at: http://portal.hud.gov/hudportal/documents/huddoc?id=DOC_10760.pdf).

informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring." *Id.* (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (emphases removed)).

Defendant Dawson asserts that she cannot be held liable for the unscheduled inspection at issue here because she was not working on August 11, 2017. (Dawson and Cox L.R. Stmts. ¶ 18.) Defendant Dawson also contends that "[w]hile [she] was generally aware that the inspections were taking place, she had no personal role in the inspection of Ms. Cox's apartment or of Mr. Worrell's entry into the apartment." (Dawson Mem. at 13; *see also* Dawson Aff. ¶ 8 ("[A]lthough I was aware of the inspections taking place, I did not play any personal role into the entry into the apartment of Ms. Cox and the activities which were undertaken once inside the unit.").)

Plaintiff Cox responds that she "had a direct conversation" with Defendant Dawson "about the contemplated entry just days before it occurred and [Plaintiff Cox] expressly instructed [Defendant Dawson] that such entry was not allowed." (Cox Opp. at 5.) Plaintiff Cox also contends that Defendant Dawson, "although allegedly not at work on the day of the entry, did have personal involvement with the police officers summoned by the agent she had sent into the dwelling, speaking with them directly before they carried out the on-premises arrest of [Plaintiff Cox's] husband [Plaintiff Brooks]." (*Id.*) At oral argument, Plaintiff Cox added that the police report also reflects that Defendant Dawson responded to Defendant Officer Dunford's call in some capacity.

Resolving all ambiguities and inferences from the record in Plaintiff Cox's favor, the Court concludes that genuine issues of material fact remain as to Defendant Dawson's personal

involvement and supervisory role in the inspection of Plaintiff Cox's apartment. Defendant Dawson herself concedes that she, as the HANH property manager, was aware that HANH was conducting unscheduled inspections of apartments over a two-month period, and only denies that she was involved with the actual entry of this apartment. (*See* Dawson Aff. ¶ 8.) And according to Defendant Officer Dunford's police report, Defendant Dawson claimed responsibility for "sen[ding] out notices to all the tenants saying they would be doing checks of the apartments for the whole month of August" when he asked her about the inspection. (Reporting Officer Narrative at 4.) Defendant Dawson also admits that she was aware that Plaintiff Cox called "the housing authority and tried to specially schedule her inspection" and that this request was declined, (Dawson and Cox L.R. Stmts. ¶ 14)—facts that at minimum suggest that Defendant Dawson knew of this "policy or custom under which unconstitutional practices occurred" and "allowed the continuance of such a policy or custom," *Grullon*, 720 F.3d at 138. Plaintiff Cox's recollection of this phone call varies from Defendant Dawson's account, in that she has testified that it was Defendant Dawson herself who took the call and rejected the request for a scheduled inspection, which deepens the dispute as to the extent of Defendant Dawson's involvement. (Cox L.R. Stmt. § B ¶ 2.)

Other evidence in the record indicates that Defendant Dawson was involved with overseeing the inspections on the day of entry and that she was physically present at 82 South Genesee Street when the police arrived. Defendant Officer Dunford's testimony indicates that Defendant Dawson was on site "standing . . . outside of the open front door of th[e] unit" when he arrived at Plaintiff Cox's apartment. (Dunford and Brooks L.R. Stmts. ¶¶ 22-27, 29; *see also* Ex. 4 (Dunford Aff.) to Dunford L.R. Stmt. [Doc. # 31] ¶ 8 ("Upon my arrival at 82 South Genesee Street I spoke with Defendant Marilyn Dawson who was employed by the New Haven Housing Authority

as the manager of the complex . . . and who was standing with another individual outside of the open front door of that residence."). At oral argument, counsel for Defendant Dawson argued that her conversation with the police officer took place over the phone, but that does not resolve the factual conflict with Defendant Dunford's testimony that she was physically present when he arrived at the apartment. And even if the conversation took place over the phone, the inference is permissible that Defendant Dawson either intervened on the inspector's behalf by calling the police or that the police were referred to her as someone with authority over the inspection, meaning Defendant Dawson had knowledge of and a supervisory role over the administrative search that occurred.

In light of this evidence, a reasonable jury could conclude that Defendant Dawson "participated directly in the alleged constitutional violation" or that she "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom." *Grullon*, 720 F.3d at 138. Thus, Defendant Dawson has not established as a matter of law that she is not liable for the inspection of Plaintiff Cox's apartment.[7]

Because Defendant Dawson has not demonstrated the absence of a constitutional violation and because a factual dispute remains as to her personal involvement in the inspection, the Court denies her motion for summary judgment on Count One of this action.

---

[7] Defendant Dawson likens the situation here to *Schofield v. Magrey*, No. 3:12CV544 JBA, 2015 WL 521418 (D. Conn. Feb. 9, 2015), where this Court granted summary judgment to a police sergeant because the plaintiff "offered no evidence that [the defendant sergeant] was personally involved in or aware of any constitutional violation," *id.* at *11.

That case is readily distinguishable from this one. In *Schofield*, the sergeant did not participate in any of the events leading up to the alleged constitutional violation, could not foresee the occurrence of the alleged constitutional violation, and was not aware of the constitutional violation until after the alleged involuntary seizure had been conducted. *See id.* at *1-*2, *11. Defendant Dawson's reliance on *Schofield* is thus misplaced.

### C. Count Two: Mr. Brooks's False Arrest Claim Against Office Dunford

At Count Two, Plaintiff Matthew Brooks alleges that Defendant Officer Edward K. Dunford arrested him for risk of injury to a minor in violation of Conn. Gen. Stat. § 53-21 without a warrant and without probable cause, thereby violating his Fourth Amendment right to be free from false arrest. (Compl. ¶¶ 10-14.) Defendant Dunford moves for summary judgment on three bases: 1) that probable cause existed for the arrest of Plaintiff Brooks for risk of injury to a minor, 2) that Plaintiff Brooks has failed to show that he received a favorable termination of this charge, and 3) that Defendant Dunford is otherwise entitled to qualified immunity against this claim.

The Court will begin by addressing Defendant Dunford's claim of qualified immunity. "[A] police officer is entitled to qualified immunity where (1) [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for [him] to believe that [his] actions were lawful at the time of the challenged act." *Betts v. Shearman*, 751 F.3d 78, 82–83 (2d Cir. 2014) (internal quotation marks omitted). "The qualified immunity standard is 'forgiving' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) (quoting *Amove v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010)).

For a defendant officer's probable cause determination to be "objectively reasonable," there must be "'arguable' probable cause to arrest." *Betts*, 751 F.3d at 83. "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks omitted). "In other words, an officer lacks arguable probable cause and is not entitled to qualified immunity only where no officer of reasonable competence could have made the same choice in similar

circumstances." *Myers v. Patterson*, 819 F.3d 625, 633 (2d Cir. 2016) (internal quotation marks omitted). "[O]n summary judgment, where all facts must be viewed in the light most favorable to the non-moving party, for the purpose of qualified immunity and arguable probable cause, police officers are entitled to draw reasonable inferences from the facts they possess at the time of a seizure based upon their own experiences." *Cerrone v. Brown*, 246 F.3d 194, 203 (2d Cir. 2001).

Defendant Dunford contends Conn. Gen. Stat. § 53-21 is sufficiently "broad" as to allow officers of reasonable competence to disagree as to the satisfaction of the probable cause test. (Dunford Mem. [Doc. # 32] at 12.) Plaintiff Brooks does not directly address this argument as to arguable probable cause, but instead broadly responds that "the law had been clearly established for more than ten years prior to this arrest that the conduct for which [Plaintiff Brooks] was arrested did not constitute risk of injury to a minor." (Brooks Opp. [Doc. # 33] at 5.)

Conn. Gen. Stat. § 53-21(a)(1), which criminalizes the "risk of injury to, or impairing morals of, children," provides:

> Any person who . . . willfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of . . . a class C felony.

The Connecticut Supreme Court has construed this language to "prohibit[] two different types of behavior: (1) deliberate indifference to, acquiescence in, or the creation of situations inimical to the child's moral or physical welfare . . . and (2) acts directly perpetrated on the person of the child and injurious to his or her moral or physical well-being." *State v. James E.*, 327 Conn. 212, 219 (2017) (cleaned up). "Under the 'situation' portion of § 53–21[(a)](1), the state need not prove actual injury to the child. Instead, it must prove that the defendant wil[l]fully created a situation

that posed a risk to the child's health or morals." *State v. Padua*, 273 Conn. 138, 148 (2005). "The situation portion of § 53–21[(a)](1) encompasses the protection of the body as well as the safety and security of the environment in which the child exists, and for which the adult is responsible." *Id.* (internal quotation marks omitted). "The plain language of the first part of § 53–21 indicates the legislature's understanding that there is a broad class of intentional conduct that can put a child's well-being seriously at risk without any physical contact by the perpetrator." *State v. Robert H.*, 273 Conn. 56, 70 n.10 (2005).

"In addition to proving that the defendant created a dangerous situation, regardless of actual injury, § 53–21(a)(1) also requires the state to prove that the defendant 'wil[l]fully or unlawfully created that situation." *James E.*, 327 Conn. at 223. "Conduct is wil[l]ful when 'done purposefully and with knowledge of [its] likely consequences.'" *Id.* "Because risk of injury to a child is a general intent crime, proof of specific intent is not a necessary requirement. Rather, the intent to do some act coupled with a reckless disregard of the consequences of that act is sufficient to establish a violation of the statute." *Id.* (cleaned up).

Although the Connecticut Supreme Court has not addressed the supervision of school-age children, it has held in *State v. Fields*, 302 Conn. 236 (2011) that it can be a violation of § 53–21(a)(1) to leave a young child home alone. In *Fields*, the Connecticut Supreme Court determined the defendant had fair notice that § 52-21 proscribes leaving a one-year-old child alone in a crib for twenty-five minutes. *Id.* at 261; *see also State v. Branham*, 56 Conn. App. 395, 397 (2000) (defendant had fair notice that § 53–21 proscribes leaving three children, all under the age of four, home alone); *State v. George*, 37 Conn. App. 388, 390–91 (1995) (defendant had fair notice that § 53–21 proscribes leaving seventeen-month-old child home alone).

Given that the Connecticut Supreme Court has applied § 53–21(a)(1) to a situation where an individual left a toddler at home alone for less than half an hour, it was not objectively unreasonable for Officer Dunford to conclude that the statute extended to a situation where an eight-year-old was left alone for more than an hour. When Defendant Dunford arrived at 82 South Genesee Street, he contacted Plaintiffs Cox and Brooks to inform them that he had been dispatched to the apartment and that minor child A.C. had been found alone and hiding underneath bedcovers. Defendant Dunford then sought an opinion from a DCF representative on whether it was reasonable to leave an eight-year-old child at home alone for an extended period of time, and proceeded to wait for both parties to return to the apartment and come back to the child. (Dunford and Brooks L.R. Stmts. ¶¶ 44-46.) Plaintiff Brooks took an hour and a half, while Plaintiff Cox took two hours. (*Id.*) From this wait, Defendant Dunford concluded that "if there was an emergency, neither of them would have been able to return to 82 South Genesee Street in a reasonable amount of time." (*Id.* ¶ 47.) Although it is uncertain whether or how the Connecticut Supreme Court might extend the logic of *Fields* to a situation involving an elementary-school student, it was not outside the bounds of reason for Defendant Dunford to believe there was arguable probable cause to arrest Plaintiff Brooks for willfully or recklessly putting A.C.'s wellbeing at risk. Even if other officers might have approached the situation differently and sought a warrant, there was at least arguable cause for the arrest conducted here.

Without squarely addressing the issue of arguable probable cause, Plaintiff Brooks argues that qualified immunity should be denied because *State v. Scruggs*, 279 Conn. 698 (2006), clearly established that the situation at issue here—that is, an eight-year-old child being left home alone

for more than an hour—is not a violation of Conn. Gen. Stat. § 53-21(a)(1).[8] But that case is not directly on point, as it resolved an as-applied challenge to a situation involving an unhygienic home—not an unsupervised child. In *Scruggs*, the Connecticut Supreme Court ruled that Conn. Gen. Stat. § 53-21(a)(1) was "unconstitutionally vague as applied to the defendant's conduct" where the conduct involved the allowance of "extreme clutter and unpleasant odor in her apartment." *Scruggs*, 279 Conn. at at 719–20 (2006). The *Scruggs* Court recognized that § 53-21(a)(1) "is broadly drafted and was intended to apply to any conduct, illegal or not, that foreseeably could result in injury to the health of a child," and so limited its ruling to the facts before it and expressly stated that it was not even going so far as "rul[ing] out the possibility that a home environment could be so squalid that an ordinary person should be expected to know that it poses a risk to the mental health of a child." *Id.* at 725. However, *Scruggs* did not clearly establish that § 53–21(a)(1) was unconstitutionally vague as to Plaintiff Brooks's behavior or that Defendant Dunford's understanding of the statute was objectively unreasonable.

Because Defendant Dunford has established that arguable probable cause existed for Plaintiff Brooks's arrest, he is entitled to qualified immunity. The Court thus grants Defendant Dunford's motion for summary judgment without reaching his other arguments.

---

[8] At oral argument, Plaintiff Brooks also suggested that *State v. Maurice M.*, 303 Conn. 18 (2011), established the proposition that § 53-21(a)(1) does not make it a crime to leave a minor child at home alone. However, that case involved a situation where a father decided "to leave his two year old child unsupervised in another room with an eight year old child," while he watched television in the living room. *Id.* at 42. Although that case may have made clear that § 53-21(a)(1) does not apply to a situation where an adult leaves a minor child alone in another room of the house, it did not reach the question of whether an adult may leave a minor child alone in a house.

### III. Conclusion

Accordingly, Defendant Dawson's Motion for Summary Judgment [Doc. # 27] as to Count One is DENIED. Defendant Dunford's Motion for Summary Judgment [Doc. # 30] as to Count Two is GRANTED. The Clerk is directed to remove Defendant Dunford's name from the case caption.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 10th day of January 2020.